Ronald A. SLOAN, Special Administrator for the Estate of Annie Bell Sloan, Appellant, and Cross–Appellee,

v.

Lawrence T. JEFFERSON, and Mary Jefferson, Appellees, and Cross–Appellants.

Nos. S–2132, S–2153.

Supreme Court of Alaska.

June 17, 1988.

Daniel T. Saluri, Law Offices of Daniel T. Saluri, P.C., Fairbanks, for appellant, and cross-appellee.

David T. Jones, Perkins Coie, Anchorage, for appellees and cross-appellants.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

## I. INTRODUCTION.

This appeal and cross-appeal raise four issues relating to findings of the superior court and a court appointed master in an action for an accounting.

## II. FACTS AND PRIOR PROCEED-INGS.

In July 1974, Annie Bell Sloan, Lawrence Jefferson, and Mary Jefferson entered into an "Operating Agreement for Tenancy in Common" ("Agreement"). Under the Agreement, Sloan received an undivided one-half interest in various improved and unimproved Fairbanks properties owned by the Jeffersons in exchange for $50,500. The Agreement also provided that Sloan and Lawrence Jefferson would be co-managers of the property, but would receive no compensation for performing managerial duties. Sloan and the Jeffersons operated some of the improved properties as rental units.

For several years after entering into the Agreement, Lawrence Jefferson spent much of his time away from Fairbanks while working on the Trans–Alaska Pipeline. During this period, he sent portions of his income to Sloan to cover expenses associated with the jointly owned property. Sloan collected rent, arranged for minor repairs, and generally managed the day-to-day affairs of the cotenants' property. The record-keeping of all parties to the Agreement was extremely poor. Jefferson was unable to document the precise amount of money he sent to Sloan over the years. Sloan, in turn, commingled funds relating to the cotenancy with monies from various other sources in her personal bank account. Her voluminous records do not clearly differentiate expenses associated with the cotenancy properties from personal expenditures or expenses incurred in connection with other properties in which she had an interest.

Sloan also made at least two large personal loans to Lawrence Jefferson in 1976 and 1977 for expenses unrelated to the cotenancy property. The record-keeping related to these loans was also extremely poor.

In late 1979 or early 1980, the business relationship between Sloan and the Jeffersons began to sour. Lawrence Jefferson asked Sloan to account for the funds he had periodically sent her, but was not satisfied with her responses. In December 1980, Jefferson revoked the power of attorney which he had previously granted to Sloan. Finally, in April 1982, the Jeffersons filed suit against Sloan seeking, *inter alia,* an accounting and declaratory judgment setting forth the rights and liabilities of the parties to the Agreement. Sloan filed a counterclaim and the cases were consolidated for trial.

Upon Sloan's motion, the superior court vacated the original trial date and referred the case to a special master to make findings of fact. The court appointed a certified public accountant as master and issued an order of reference and schedule for completion of the master's duties. The master held hearings at which both sides testified and submitted evidence. After considering the volume of disputed expense records, the master, with the parties' assent, directed the parties to review the records together and allocate claims as personal expenses, expenses of the cotenancy, and expenses upon which the parties disagreed. The parties met and submitted their results to the master.[1] Thereafter the master filed his final report.

After a bench trial, the superior court accepted all but two of the master's findings. The court determined the master clearly erred in determining the amount Lawrence Jefferson contributed to the cotenancy from his paychecks and in allocating repair charges for one of the cotenant properties. The superior court therefore awarded the Jeffersons $53,124.32. Sloan

---

1. The master then issued his tentative report. As authorized by the superior court, the master directed the parties to list their objections which had arisen during the master's proceedings, as well as to submit a list of issues which the parties believed the court should address.

appeals from the superior court's judgment and the Jeffersons cross-appeal.

A. *Did the Superior Court Err in Holding That the Master Properly Applied the Burden of Proof to Sloan and in Accepting the Master's Findings Based on This Burden?*

Sloan claimed she was entitled to credit for various expenditures she allegedly made for expenses associated with cotenancy properties. The master found that Sloan served as manager and record-keeper for the cotenants, and thus bore the burden of proving the amount to which she was entitled by documenting her claims for expenses, rental income she received, and contributions she received from the Jeffersons. The superior court concurred with these findings. Sloan argues on appeal that the superior court erred in finding that Sloan served as managing cotenant, by allocating the burden of proof to Sloan, and by accepting portions of the master's findings based on application of that burden.

■ This court will not reverse the factual findings of the superior court unless those findings are clearly erroneous. Alaska R.Civ.P. 52(a); *State v. Phillips*, 470 P.2d 266, 268 (Alaska 1970). A finding is "clearly erroneous" if it leaves the reviewing court "with a definite and firm conviction that a mistake has been made." *Hill v. Ames*, 606 P.2d 388, 389–90 (Alaska 1980). Here, although the Agreement specified that Lawrence Jefferson and Sloan were to be "co-managers" of the cotenant properties, the testimony of the parties indicates that Jefferson spent little time in Fairbanks and that Sloan ran the day-to-day affairs of the cotenancy. Additionally, evidence indicates that Sloan kept the cotenants' records and maintained the cotenants' funds in her personal bank account. Therefore, we hold the superior court's conclusion that Sloan served as "managing cotenant" is not clearly erroneous.

■ Allocation of the burden of proof is a question of law and thus subject to this court's independent review. *See, e.g., Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979). The party asserting a fact generally bears the burden of proving that fact. *Skagway City School Bd. v. Davis*, 543 P.2d 218, 222 (Alaska 1975) (defendant has burden of persuasion in establishing those facts which he is required to affirmatively plead); *Nordin Constr. Co. v. City of Nome*, 489 P.2d 455, 465–67 (Alaska 1971) (burden of proof for establishing the value of benefits conferred rests upon proponent); *Yeazell v. Copins*, 98 Ariz. 109, 402 P.2d 541, 546 (1965); *Osborn v. Manning*, 685 P.2d 1121, 1124 (Wyo.1984) (burden of proof is on party asserting the affirmative of any issue). This is particularly true when the party asserting a fact controls the evidence which bears upon that fact. *Holcomb v. Davis*, 431 S.W.2d 881, 883 (Ky.1968) (partner maintaining partnership records must conclusively show credits he claims, and all ambiguities will be resolved against him); *Dixon v. Anadarko Prod. Co.*, 505 P.2d 1394, 1396 (Okla.1972) (when evidence to prove a fact is within a party's control, that party bears the burden of producing the evidence).

■ In this case, both the master and the superior court determined that Sloan acted as managing cotenant, kept the cotenants' records, and maintained the cotenants' funds in her personal bank account. Therefore, Sloan is in the better position to document her claims for expenses she allegedly incurred on behalf of the cotenants, and the master and the superior court did not err by imposing on Sloan the burden of proving the amount and legitimacy of her claims.[2]

2. Sloan also argues that the superior court erred by accepting the master's findings when the master failed to adhere to instructions from the court, failed to consider the evidence submitted by Sloan bearing on expenses of the cotenancy, and failed to perform "certain accounting procedures." These claims are without merit. The superior court concurred with the master's conclusion that a computer generated list of checks submitted by Sloan did not adequately or conclusively support her expense claims. The court also found that the master had not listed individual invoices and expense allocations in his report, but concluded this procedure would

We therefore hold that the superior court did not err in allocating the burden of proof to Sloan. We further conclude that the superior court did not err in accepting the master's factual conclusions which were based in part on that allocation.

B. *Did the Superior Court Err in Holding That Sloan Waived Her Right to Object to Methods Used by the Master to Calculate Her Expenditures for Cotenancy Expenses?*

The superior court determined that Sloan did not object to methods the master used to calculate her expenditures for cotenancy expenses until trial. The court thus concluded that Sloan waived her right to object to the master's treatment of her expense claims. Sloan argues that she raised timely objections to the master's methods, and therefore did not waive her right to present this issue to the trial court for its consideration.

.We need not address this issue. Despite its holding that Sloan waived her right to object to the master's methodology, the superior court expressly ruled on all objections to the master's methods which Sloan raised during trial and raises in this appeal. The court determined listing each invoice item in the master's report would be expensive, time consuming, and of no material benefit to the court or parties. The court also found the computer list submitted by Sloan did not adequately or conclusively support her expense claims. Finally, the court held the master had properly applied the burden of proof to Sloan. Therefore, even assuming *arguendo* that the superior court erred in holding that Sloan waived her right to object to the master's methodology, the ruling was harmless error. *See, e.g., Kennedy Assoc., Inc. v. Fischer,* 667 P.2d 174, 182 (Alaska 1983) (failure to apply objective standard was harmless error when evidence established that lender's dis-

satisfaction with building was objectively reasonable); *Atlantic Richfield Co. v. State,* 659 P.2d 930, 934 (Okla.1983) (unsuccessful party cannot complain of trial court's error when he would not have been entitled to succeed anyway). Harmless error must be disregarded. *Veal v. Newlin, Inc.,* 367 P.2d 155, 157 (Alaska 1961).

C. *Did the Superior Court Err by Determining That Lawrence Jefferson Contributed $133,000.00 to the Cotenancy?*

The master concluded documentary evidence verified that Lawrence Jefferson endorsed $77,324.00 in paychecks to Sloan as contributions toward the cotenancy's expenses. The superior court put this figure at $77,373.87. Records of Jefferson's paychecks were unavailable for at least two years during which the Agreement was in effect, but Jefferson claims to have sent checks to Sloan during that period as well. To arrive at an estimate of Jefferson's total payments to Sloan,[3] the master computed that Jefferson endorsed 90% of the money he received in paychecks to Sloan for the period for which records were available. The master then applied this figure to Jefferson's total income during the period for which no records were available, and concluded that Jefferson contributed $182,-769.00 to Sloan for expenses associated with the cotenancy. During pre-trial discovery, Sloan admitted receiving $133,-117.00 in contributions from Jefferson. The superior court rejected the master's conclusion and held that Jefferson should be credited with a contribution of $133,-117.00, the amount Sloan admitted receiving. Sloan appeals this holding, arguing that her previous admission was erroneous and maintaining that Jefferson should be credited only with the contribution amount supported by documentary evidence, $77,-373.87. Jefferson cross-appeals, arguing that the superior court erred in rejecting

---

have been time consuming, expensive, and of no material benefit to the court or parties. Even a cursory review of the record supports these conclusions. Therefore, the superior court's acceptance of the master's findings was not clearly erroneous.

**3.** Sloan herself was unable to supply the master with information identifying the source of many of the deposits to the account in which she kept the cotenants' funds.

the master's finding that Jefferson contributed $182,769.00 to the cotenancy.

█ When a trial court adopts a master's findings, they become the findings of the court. Alaska R.Civ.P. 52(a). This court will not set aside a trial court's findings of fact unless those findings are clearly erroneous. *Id.; Phillips*, 470 P.2d at 268. However, when a trial court rejects the factual findings of a master, a reviewing court owes no deference to the trial court's findings. *Nienow v. Nienow*, 268 S.C. 161, 232 S.E.2d 504, 509 (1977); *First Nat'l Bank of Martinsville v. Cobler*, 215 Va. 852, 213 S.E.2d 800, 802 (1975). We therefore review *de novo* the question of whether the superior court erred in rejecting the master's finding that Jefferson contributed $182,769.00 to the cotenancy in the form of paychecks endorsed to Sloan.

█ Our review of the record convinces us that the superior court erroneously rejected the master's finding. Lawrence Jefferson's testimony furnishes a basis for the master's conclusion that Jefferson sent 90% of his income to Sloan during the disputed period. Additionally, an affidavit from the Jeffersons' accountant, which estimates that Jefferson sent Sloan a sum "in excess of $177,156.88," tends to support the master's finding that Jefferson contributed $182,769.00 to the cotenancy. Sloan, on the other hand, presented no reliable evidence on the amount that Jefferson contributed. During discovery, Sloan admitted Jefferson had sent her $133,117.00. At a hearing before the master, however, Sloan's attorney put Jefferson's contribution at $90,000.00. Sloan now claims her admission during discovery was erroneous, and argues that Jefferson paid only $77,-373.87, the amount supported by documentary evidence. These conflicting figures undermine Sloan's credibility on the issue of Jefferson's contributions. Moreover, the master could have reasonably inferred that it was unlikely that Lawrence Jeffer-

son would have contributed 90% of his paychecks during the period for which records are available to the cotenancy, but contributed nothing during at least two years when no records are available, as Sloan now suggests. Finally, Sloan herself was evasive when the master questioned her about Jefferson's contributions. For these reasons, we hold that the superior court erred by rejecting the master's finding concerning the Jeffersons' contributions to the cotenancy.

D. *Did the Superior Court Err in Failing to Account for the July 1977 Promissory Note from Jefferson to Sloan?*

In July 1977, Lawrence Jefferson gave Sloan a promissory note for $28,000.00 Jefferson testified at trial that he did not recall the obligation for which he gave Sloan the note. However, he also testified that he would have had no reason to borrow that amount of money from Sloan other than to make a large loan payment to Kansas City Life.[4] Earlier in 1977, Sloan had made a $33,000.00 payment to Kansas City Life on Jefferson's behalf. Sloan, however, testified that the July 1977 promissory note was not related to the Kansas City Life payment, but was instead a personal loan for fertilizer and other expenses associated with Jefferson's plantation in Mississippi.[5]

The superior court made no express findings concerning the disputed promissory note. Sloan argues that the superior court erred in failing to address this issue, and asks this court to give her credit in the accounting for the full value of the note plus interest. The Jeffersons respond by noting that the master's findings gave Sloan credit for the $33,000.00 payment she made on Jefferson's behalf to Kansas City Life. Since the superior court accepted this finding, the Jeffersons argue that the court's failure to mention the July 1977 promissory note indicates the court implic-

---

4. Jefferson's obligation to Kansas City Life was for loan payments on a plantation Jefferson owned in Mississippi, and thus was unrelated to expenses or obligations of the cotenants under the Agreement.

5. The expenses associated with Jefferson's plantation were unrelated to expenses or obligations of the cotenants under the Agreement.

itly agreed with the Jeffersons' position that the note represents Jefferson's Kansas City Life payment.

■ The master clearly indicated that he would not decide any questions relating to the July 1977 promissory note:

> I see a loan that Mr. Jefferson has signed and is (indiscernible—manner of speech) to Mrs. Sloan. I don't think that money came out of the partnership funds, and I think this is an issue I'm going to leave up to Judge Greene. I guess, I'm mainly concerned about (indiscernible—pouring water) partnership funds. I don't believe this came out of the partnership, unless Mr. Wells can show that it did. In that event, I'll let Judge Greene decide the issue.

Both parties addressed this issue in their pre-trial briefs to the superior court. If the court believed the Jeffersons' argument that the note covered the Kansas City Life payment Sloan made on behalf of Lawrence Jefferson, the court was correct in refusing to award Sloan a judgment on the note because the master had already accounted for the note by giving Sloan credit for the payment she made to Kansas City Life. On the other hand, if the trial court believed Sloan's argument that the note was for a loan Sloan gave to Jefferson to cover payments other than the one to Kansas City Life, the court erred by failing to grant Sloan a judgment on the note. However, without express findings from the superior court in regard to the disputed note, there is no way to determine the court's grounds for refusing to grant Sloan a judgment on the note. A trial court's findings must be sufficiently detailed and explicit to give an appellate court a clear understanding of the ground on which the trial court reached its decision. *Wigger v. Olson,* 533 P.2d 6, 7 (Alaska 1975) (quoting *Merrill v. Merrill,* 368 P.2d 546, 548 (Alaska 1962)). If a trial court fails to provide such findings, this court will remand the case to the trial court for more specific findings. *Wigger,* 533 P.2d at 9; *Johnson v. Johnson,* 544 P.2d 1028 (Alaska 1976), *cert. denied,* 434 U.S. 1048, 98 S.Ct. 897, 54 L.Ed.2d 800 (1978) (case remanded to trial court for more specific findings when supreme court was unable to understand basis for court's decision). Therefore we remand this issue to the superior court for entry of appropriate findings of fact.

E. *Did the Superior Court Err in Allocating $17,420.00 in Interest Charges to the Jeffersons?*

Included among the Jeffersons' liabilities as determined by the master was $17,400.00 for interest on a $26,000 personal loan from Sloan to Jefferson in January 1976.[6] Since the superior court adopted all of the master's findings except for two specific findings unrelated to the January 1976 loan, the court implicitly charged the Jeffersons with interest on the loan. In their cross-appeal, the Jeffersons argue that the superior court erred by failing to make specific findings as to whether they were liable for interest on the January 1976 loan, and maintain they are in fact not liable for interest on that loan.

Again, the parties disagree over the facts relating to the loan. Jefferson claims that money he sent to Sloan in 1977 satisfied his obligations on the note. Sloan, on the other hand, maintains that Jefferson did not repay the loan until the sale of a property owned by the cotenants in August 1981, at which time over $17,000 in interest had accrued on the obligation.

The master did not specifically mention interest on the January 1976 note in his report, but included the interest in his calculation of the Jeffersons' liabilities. The superior court received testimony on this issue, and the Jeffersons addressed interest on the note in their list of issues for the court's consideration as well as in their pre-trial memorandum. The court did not make any specific finding as to whether the Jeffersons were liable for interest on the loan, but adopted the master's calculation of the Jeffersons' liabilities which included interest on the January 1976 loan. The Jeffersons thereafter moved the superior court to reconsider its decision, specifically arguing that they were not liable for inter-

6. The parties put the disputed amount at $17,420.00.

est on the loan in question. The court did not alter its findings.

The Jeffersons' contention that the superior court erred by failing to make explicit findings on their liability for interest on the January 1976 loan is without merit. The master's report charged interest on the January 1976 loan to the Jeffersons. Though the Jeffersons made it clear to the court that they disagreed with this portion of the master's report, the superior court nevertheless accepted the master's findings. Thus, despite the lack of any specific finding by the court, we conclude that the superior court implicitly found the Jeffersons liable for interest on the January 1976 loan.

■ Since both the master and the superior court found the Jeffersons liable for interest, this court will not disturb this determination unless we find it clearly erroneous. *Phillips*, 470 P.2d at 268. The Jeffersons have submitted no documentary evidence showing that Lawrence Jefferson paid off the loan prior to August 1981. The testimony as to when he paid off the loan is conflicting. Therefore, we hold the superior court did not err in accepting the portion of the master's report charging interest on the January 1976 loan to the Jeffersons.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings.